2010 VT 69

**Janet DEMAR v. DEPARTMENT OF LABOR (Stay and Play Day Care Center, Employer)**

[6 A.3d 695]

No. 09-271

¶ 1. July 1, 2010. Claimant appeals from the Employment Security Board's decision denying her request for unemployment benefits based on its conclusion that she left her job voluntarily without good cause attributable to her employer. We affirm.

¶ 2. For the most part, the material facts are not in dispute. Claimant was employed as a preschool teacher at a daycare center. She was hired in the spring of 2008 at an hourly rate of $12.75, with five paid vacation days. She was also given the title of director with the understanding that it would not entail any additional duties. In the late fall of 2008, the daycare began losing students in the

economic downturn. After speaking to her accountant, the employer realized that she would have to cut costs. Claimant's hours were cut back from forty per week to thirty-six. Then, on January 26, 2009, the employer and claimant met to review claimant's work at the daycare. At the meeting, the employer informed claimant that her pay would be reduced to an hourly rate of $10.50, that her paid vacation days would be reduced to two, and that she would no longer keep the director's title. The employer presented claimant with a written evaluation noting some deficiencies in her work, but it was apparent that the principal reason for the cut in pay was the daycare's financial situation. Claimant was not happy about the pay reduction and declined to sign the evaluation, but she continued to work at the daycare.

¶ 3. On March 8, the employer sent claimant a text message asking her if she would be willing to go back to a forty-hour work week. Claimant indicated that she might, but wondered when her pay would go back up. The employer did not respond. On Friday, March 13, claimant took the day off to have her truck repaired and then called the employer to let her know that she would need another day off the following week to pick up the truck. After the employer hung up on claimant, a testy exchange of text messages ensued. Each accused the other of acting disrespectfully. Claimant expressed her continuing displeasure at the earlier cut in pay. The employer threatened to put a written warning in claimant's file if she took time off without permission. On Saturday, March 21, the employer sent claimant a text message indicating that they had mandatory training Thursday evening, March 26, in conjunction with the center's contract with the Head Start program. Claimant protested when the employer informed her that she would not be paid for attending the meeting. The employer suggested that she and claimant meet to discuss their differences. Claimant agreed, but requested the presence of a neutral third party. The employer refused to include a third party, but said that she would be willing to meet the next day. Claimant stated that she would not be there.

¶ 4. On Sunday, March 22, claimant sent a text message to the employer saying that she did not feel well and would not be coming to work the next day. On Tuesday, March 24, claimant sent the employer a text message stating that she and her boyfriend had talked and decided that it would not be a good idea for her to continue to work for the daycare. As it turned out, claimant's last day of work was Friday, March 20.

¶ 5. After she quit her job, claimant sought unemployment benefits. Her claim was initially denied by a claims adjudicator based on her failure to demonstrate that she left her last job for good cause attributable to her employer. See 21 V.S.A. § 1344(a)(2)(A) (individual disqualified for benefits if "[h]e or she has left the employ of his or her last employing unit voluntarily without good cause attributable to such employing unit"). Following a telephonic merits hearing, an administrative law judge upheld the claim adjudicator's decision. The administrative law judge concluded that the proximate cause of claimant's decision to quit her job was the March 21 text-message exchange and the underlying issue concerning the employer's insistence that claimant attend the Head Start training session without compensation. The Employment Security Board affirmed the administrative law judge's decision. At the hearing before the Board, claimant, who was represented by counsel at the time, argued that the issue concerning the Head Start meeting was merely the last of a series of issues dating back to the employer's January 26 decision to cut claimant's pay. According to claimant, she stayed on the job after the pay reduction to try and

work things out, but eventually realized that it was not possible. The Board rejected this argument, stating that the evidence demonstrated that the proximate cause of her decision to quit her job was the March 21 text-message exchange in which the employer required her to attend the Head Start training without pay. According to the Board, it was unreasonable for claimant to refuse to discuss the matter with the employer without the presence of a third party.

¶ 6. On appeal, claimant argues that the employer's acts, particularly the decision to cut her pay and vacation time, caused her to quit her job. This argument does not directly address the basis for the Board's decision. As the Board intimated, claimant would have had good cause to quit her job if the proximate cause for her quitting had been the unilateral cut in pay. *Branch v. Dep't of Employment Sec.*, 142 Vt. 609, 610, 458 A.2d 1121, 1122 (1983) (per curiam) (affirming Board's conclusion that employee who quit after employer gave her choice of reduced wages or leaving employment had good cause attributable to employer for quitting). But the evidence in this case revealed that claimant worked at her job for nearly two months after the pay reduction before quitting. If claimant's frustrations concerning her job originated with the cut in pay, she still continued working for approximately eight weeks until another separate incident arose that led to her decision to leave. Although this is a close case, we conclude that, under the circumstances, the Board did not err in holding that the proximate cause of claimant's decision to quit was the exchange of text messages regarding the employer's insistence that she attend the Head Start training without pay. Cf. *Rushlow v. Dep't of Employment & Training*, 144 Vt. 328, 331, 476 A.2d 139, 141 (1984) (upholding Board's finding that employee quit because he thought employer was going to limit his hours rather than because he refused to drive unsafe truck).

¶ 7. Moreover, we conclude that the record contains credible evidence to support the Board's ruling that it was unreasonable under the circumstances for claimant to refuse to meet with the employer about the unpaid mandatory training unless a third party was present. See *Branch*, 142 Vt. at 610, 458 A.2d at 1122 ("Our standard of review in unemployment compensation cases is clear: we are to affirm the findings of the Board as long as there is credible evidence to support them, even if there is substantial evidence to the contrary."). The daycare's employee handbook was, at best from claimant's perspective, ambiguous as to whether employees were to be paid to attend mandatory meetings concerning professional development. The mandatory training was scheduled for March 26, but plaintiff quit two days earlier after refusing the employer's offer to meet with her. Cf. *Rushlow*, 144 Vt. at 331, 476 A.2d at 141 (stating that quitting for anticipatory reasons is not good cause attributable to employer, and concluding that employee failed to demonstrate that meeting with employer would have been fruitless). Nothing in the record demonstrates that it would have been fruitless for claimant to meet with the employer alone or that the employer had created such an intimidating environment as to justify claimant's insistence on the presence of a third party. In short, upon review of the record, we uphold the Board's conclusion that claimant failed to demonstrate that she quit her job for good cause attributable to her employer. See *Skudlarek v. Dep't of Employment & Training*, 160 Vt. 277, 280, 627 A.2d 340, 342 (1993) (noting that, in cases of voluntary separation, employee has burden of demonstrating that separation was for good cause attributable to employer).

*Affirmed.*

¶ 8. **Johnson, J.,** dissenting. The majority's decision today requires an em-

ployee with good cause to leave her employment to jump through an unreasonable and futile hoop to maintain eligibility for unemployment compensation benefits. In doing so, the majority undercuts the legislative purpose behind our unemployment compensation and wage and hour laws — laws that are meant to protect workers from exploitative and unfair working conditions. Because I cannot agree that an employee's reasonable refusal to attend what can only be described as a futile meeting bars an otherwise valid claim to unemployment compensation, I respectfully dissent.

¶ 9. Claimant began working for the Stay and Play Day Care Center as a preschool teacher in the spring of 2008. Beginning sometime in November 2008, the daycare began losing students, and cash flow became a serious problem. In late January 2009, claimant was given an employment review, following which claimant's title of director was eliminated (claimant's employment duties, however, remained the same), her hourly pay was reduced from $12.75 to $10.50, and her vacation days were reduced. The pay cut was chiefly a result of the daycare's financial troubles. Claimant continued to work at the daycare center for the next two months, although the relationship between claimant and the employer became increasingly strained. On March 21, the employer informed claimant, through a text message, that she would be required to attend a training session for the Head Start program, which was scheduled for the evening of March 26 after regular work hours. Claimant refused after the employer told her she would not be paid for the hours spent attending the training. Claimant and employer spoke, again largely through text messaging, of having a face-to-face meeting to discuss their problems. The text messages, however, quickly became contentious, and at one point the employer described the proposed meeting as a "show down." Claim-ant refused to attend the proposed meeting without a third party present, but the employer would not acquiesce to this request. Claimant sent a text message to the employer on March 24 resigning her position and subsequently applied for unemployment compensation benefits, the denial of which is the subject of this appeal.

¶ 10. The crux of the Board's decision to deny benefits here rests on its conclusion that, despite the legitimate reason claimant had for leaving, the fact that she failed to attend a final meeting with the employer foreclosed her eligibility for unemployment compensation benefits. The Board's narrow analysis effectively converts the requirement that a claimant make some effort to remedy the work situation — what is essentially a notice requirement to ensure that an employer is aware of the grievance and has an opportunity to rectify it — into a futile and unreasonable hurdle to unemployment benefits. Even under the deferential standard of review owed to the Board's conclusions, the established facts — particularly the deterioration of the employment relationship preceding the final dispute over unpaid training and the employer's characterization of the proposed meeting to discuss the dispute as a "show down" — do not support the result reached by the Board and "compel a different result as a matter of law." *Burke v. Dep't of Employment Sec.*, 141 Vt. 582, 584, 450 A.2d. 1156, 1157 (1982) (quotations omitted).

¶ 11. Though we have required that an employee make "some effort to remedy alleged poor working conditions or else demonstrate that such effort would be unavailing," *Rushlow v. Dep't of Employment & Training*, 144 Vt. 328, 331, 476 A.2d 139, 141 (1984), we have also noted that an employee should not be penalized for making an effort to resolve a dispute and that the focus of our inquiry "must be

primarily on the conduct of the employer." *Skudlarek v. Dep't of Employment & Training*, 160 Vt. 277, 282, 627 A.2d 340, 343 (1993). Indeed, the very purpose of this "some effort to remedy" requirement is to put an employer on adequate notice of the grievance so that he or she has an opportunity to rectify the problem. In *Garcia v. Department of Employment & Training*, for instance, we affirmed the Board's conclusion that the claimant's access to unemployment benefits was not barred because he had not made a reasonable effort to inform his employer of his grievance. 145 Vt. 331, 337, 488 A.2d 762, 766 (1985). We noted that the claimant had expressly told his employer about his complaint and that his efforts distinguished his case "from those involving a claimant's failure to contact the employer prior to quitting." *Id.*; accord *Colduvell v. Unemployment Comp. Bd. of Review*, 408 A.2d 1207, 1208 (Pa. Commw. Ct. 1979) (although good cause existed, where claimant did not give owners "opportunity to understand the nature of her objection, before resigning," she did not satisfy legal requirement of reasonable attempt to stay on the job).

¶ 12. Here, the employer was unequivocally on notice of claimant's grievance with regard to the unpaid training, an event which amounts to a breach of the employment contract (and possibly wage and hour laws, see 29 C.F.R. § 785.27) and thus would have provided good cause to quit. See *Burke*, 141 Vt. at 585, 450 A.2d at 1158 (concluding that an employer's failure to pay consideration agreed upon for claimant's service gave claimant good cause to leave "because his employer failed to keep its side of the bargain"); *Allen v. Dep't of Employment Sec.*, 141 Vt. 132, 134, 444 A.2d 892, 893 (1982) (concluding good cause to leave existed following failure to provide promised training); *Seymour v. Dep't of Employment Sec.*, 137 Vt. 79, 80, 399 A.2d 519, 520 (1979) (per curiam) (concluding good

cause to leave existed following breach of agreement to provide transportation); *Zablow v. Dep't of Employment Sec.*, 137 Vt. 8, 9, 398 A.2d 305, 306 (1979) (per curiam) (concluding that good cause to leave existed following repeated failure to pay wages when due); *Shorey v. Dep't of Employment Sec.*, 135 Vt. 414, 415, 377 A.2d 1389, 1390 (1977) (per curiam) (concluding that good cause to leave existed following failure to provide promised raise).

¶ 13. The discussion about the grievance, which occurred over a series of increasingly contentious text messages, had reached a stalemate. Indeed, the employer used the words "end of discussion" in her final text message on the subject and characterized the proposed meeting to discuss the dispute as a "show down." These facts demonstrate that it was entirely reasonable for claimant to conclude that there was absolutely no chance that the meeting would resolve the underlying issue — the employer's refusal to pay claimant for the mandatory training — and that attendance at this "show down" would be futile. There is no indication that had claimant attended this meeting, the end result would have been any different. Instead, the Board's conclusion that claimant's failure to attend this meeting negates the employer's breach of the employment contract puts claimant in the absurd position of having to jump through a futile and arbitrary hoop before she can access compensation to which she is otherwise entitled.

¶ 14. Further, the Board's narrow "proximate cause" analysis — which ignores the fact that the requirement that claimant attend a mandatory training without pay was part of a larger breakdown in the employment relationship — not only fails to reflect our traditional broad construction of the unemployment compensation statute, but indeed fails to adequately reflect the reality and complexity of any employment relationship, a

relationship which is rarely defined by one single event. Claimant's employment relationship had been deteriorating for months preceding what the Board ultimately determined to be the proximate cause of claimant's departure — the dispute over the unpaid mandatory training. Moreover, the previous pay cut, which as the Board conceded would have given claimant good cause to quit, was intimately related to what became the final blow — the request that claimant work without pay. Compare with *Rushlow*, 144 Vt. at 331, 476 A.2d at 141 (upholding Board's finding that decision to quit was based on threat of reduction in hours rather than separate and unrelated event of refusal to drive unsafe truck). Indeed, the pay cut, loss of title, and loss of vacation days were events that the Administrative Law Judge (ALJ) (and the Board through its adoption of the ALJ's findings) characterized as "a substantial material change in . . . conditions of employment," such that if claimant had quit immediately after these changes, she would have met her burden to demonstrate she had good cause to quit. But claimant did not quit; instead, she proceeded to make a good faith effort to ride out the financial difficulties of the daycare center. This effort, however, was met with what became the final insult in a deteriorating employment relationship: a requirement that claimant work without pay.

¶ 15. The Board's conclusion that because claimant refused to sit down to yet another meeting with her employer about the most recent in a long line of disputes over essentially the same topic, she failed to meet her burden to attempt to work out her grievances, is simply not supported by the facts and is exactly the sort of "logically incoherent" decision we found thwarted the clear intent of our unemployment compensation law in *Burke*, 141 Vt. at 586, 450 A.2d at 1158.

There, we found that an employee had good cause to quit where his employer allowed his medical benefits to lapse and then lied about reinstating the benefits even though "the employer might make it up tomorrow." *Id.* at 587, 450 A.2d at 1158. In doing so, we overruled the Board's decision, which concluded that because the employee had not been hurt by the lapse in coverage and because there was no reason for the employee not to believe the employer's assurance that the benefits were reinstated, good cause to leave did not exist. Instead, we held that the Board's refusal to find good cause in that situation put the employee in the "intolerable situation" of waiting for another lapse before he could quit. *Id.* at 586, 450 A.2d at 1158. Similarly, here, the Board's decision places claimant in the same intolerable situation of enduring a series of adverse employment actions in the vain hope that the employer "might make it up tomorrow." *Id.* at 587, 450 A.2d at 1158.

¶ 16. Time and again, we have held that in light of its remedial purpose, we should construe our unemployment compensation law broadly. The majority pays lip service to this basic principle, and then proceeds to credit the stringent test employed by the Board to determine whether good cause to leave exists, looking at the most recent adverse event in claimant's employment history in total isolation, rather than as a pattern of disputed payment practices. By ignoring the three months following the pay cut, title loss, and vacation day reduction, in which employee made a good faith effort to ride out the daycare center's period of economic hardship, the majority essentially penalizes claimant for this effort. Because I believe that claimant did have good cause to leave her employment, I would reverse the Board's denial of unemployment benefits.

¶ 17. I am authorized to state that Justice Dooley joins this dissent.